Argued and submitted May 10, affirmed August 9, 2010

FRIENDS OF THE COLUMBIA GORGE, INC.;
Columbia Riverkeeper; Friends of Mount Hood; Futurewise;
Adventure Cruises; Mt. Hood Hamlet Bed & Breakfast;
Laurie Balmuth; David Berger; Lydie Boyer; Ron Carroll;
Joan Chase; Susan Garrett Crowley; Kathleen Fitzpatrick;
Jurgen Hess; Sherri Irish; Larry Keister; Chris Lloyd;
Ken Maddox; Pat Meeks; Sherry Meier; Blayney Myers;
Mary Repar; Tom Rousseau; Paul Smith; Dawn Stover;
Carol Taylor; Jim Weaver; Judith Werner; Mary Wiley;
Polly Wood; and Tom Wood,
*Petitioners,*

*v.*

COLUMBIA RIVER GORGE COMMISSION,
*Respondent.*

Columbia River Gorge Commission
PA0601; A139921

238 P3d 378

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Gary K. Kahn argued the cause for petitioners. With him on the briefs was Reeves, Kahn & Hennessy.

Jeffrey B. Litwak argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

DUNCAN, J.

▮▮▮▮▮▮▮

### DUNCAN, J.

This is a land use case involving the site of a former lumber mill in Skamania County, Washington, across the Columbia River from Oregon. The site is located within the Columbia River Gorge National Scenic Area (the scenic area) and is subject to the scenic area's land use management plan. Petitioners seek judicial review of a final order of the Columbia River Gorge Commission (the commission) amending the management plan to make it possible to convert the mill site to a recreation resort.

On judicial review, petitioners make three assignments of error. In one, they assert that the commission lacked the authority to amend the management plan because conditions in the scenic area had not significantly changed. In a second, they assert that the amendment is inconsistent with the purposes and standards of the Columbia River Gorge National Scenic Area Act (the Act). 16 USC §§ 544 - 544p. In a third, they assert that the commission inappropriately determined that the mill site contains an existing industrial use, a determination that, according to petitioners, can only be made by Skamania County. For the reasons explained below, we affirm.

## I. BACKGROUND

Recent opinions by this court and the Supreme Court have discussed in some detail the statutory and regulatory framework governing actions by the commission.[1] Before addressing petitioners' assignments of error, we briefly recount that background as it is pertinent to the issues presented in this case. We then describe the facts that gave rise to this dispute. We supplement that information as

---

[1] *See Friends of Columbia Gorge v. Columbia River Gorge*, 215 Or App 557, 171 P3d 942 (2007) (*Friends A125031*), *aff'd in part, rev'd in part, Friends of Columbia Gorge v. Columbia River (S055722)*, 346 Or 366, 213 P3d 1164 (2009) (*Friends S055722*); *Friends of Columbia Gorge v. Columbia River (A131299)*, 218 Or App 232, 179 P3d 706 (2008) (*Friends A131299*), *aff'd, Friends of Columbia Gorge v. Columbia River (S055916)*, 346 Or 433, 213 P3d 1191 (2009) (*Friends S055916*); *Friends of Columbia Gorge v. Columbia River (A133281)*, 218 Or App 261, 179 P3d 700 (2008) (*Friends A133281*), *aff'd, Friends of Columbia Gorge v. Columbia River (S055915)*, 346 Or 415, 212 P3d 1243 (2009) (*Friends S055915*). We refer to those cases using the short references noted above throughout this opinion.

necessary in our discussion and resolution of each of petitioners' individual assignments of error.

A.  *Statutory and Regulatory Framework*

The scenic area encompasses roughly 292,000 acres and includes portions of six counties, Multnomah, Hood River, and Wasco counties in Oregon and Clark, Skamania, and Klickitat counties in Washington. It was created in 1986 by the Act. The Act has two purposes:

> "(1)   to establish a national scenic area to protect and provide for the enhancement of the scenic, cultural, recreational, and natural resources of the Columbia River Gorge; and
>
> "(2)   to protect and support the economy of the Columbia River Gorge area by encouraging growth to occur in existing urban areas and by allowing future economic development in a manner that is consistent with paragraph (1)."

16 USC § 544a. Thus, the first and primary purpose of the Act is to protect and enhance the resources of the gorge, and the secondary purpose is to support the economy of the gorge area by encouraging growth in existing urban areas and by otherwise allowing economic development, but only in a manner that is consistent with the first purpose.

As authorized by the Act, Oregon and Washington entered into an interstate compact and created the commission, a regional agency with regulatory authority over the scenic area. *See* ORS 196.150; RCW 43.97.015 (reflecting ratification of the compact in Oregon and Washington, respectively). The Act charges the commission with developing, implementing, and administering a management plan for the scenic area, with the concurrence of the Secretary of Agriculture (the Secretary). The Act divides the scenic area into three types of subareas: urban areas, which are not subject to the scenic area regulations in the management plan; "special management areas" (SMAs), over which the Secretary has primary responsibility; and the remaining area, which is referred to as the "general management area" (GMA).[2]

---

[2] The term "general management area" is not defined in the Act, but the commission uses that term throughout the management plan to refer to the remaining land in the scenic area. In addition, the statutes that the Oregon legislature

The Act provides that, "[n]o sooner than five years after adoption of the management plan, but at least every ten years, the Commission shall review the management plan to determine whether it should be revised." 16 USC § 544d(g). It also provides that the commission may amend the management plan outside of the "usual" revision cycle:

> "*If the Commission determines at any time that conditions within the scenic area have significantly changed, it may amend the management plan.* The Commission shall submit amendments to the management plan to the Secretary for review, in accordance with the provisions of this section for adoption of the management plan."

16 USC § 544d(h) (emphasis added). The commission adopted an administrative rule setting forth additional requirements for amending the plan, which provides, in part:

> "*The Commission must find the following criteria are satisfied before it approves an amendment to the Management Plan*:
>
> "(1)  *Conditions in the Scenic Area have significantly changed. This means*:
>
> "(a)  Physical changes that have widespread or major impacts to the landforms, resources, or land use patterns in the Scenic Area;
>
> "(b)  *New information or inventory data regarding land uses or resources that could result in a change of a plan designation, classification, or other plan provision*;
>
> "(c)  *Changes in legal, social, or economic conditions, including those that affect public health, safety, or welfare, not anticipated in the Management Plan*; or
>
> "(d)  A demonstrable mistake in the Management Plan that has resulted in significant impacts or that involves significant issues, such as, but not limited to, a land use guideline that is less protective of Gorge resources than the policies the guideline was intended to implement; a land use designation that does not conform to the corresponding designation policies; or two or more guidelines that cannot be reasonably reconciled.

---

enacted to implement the Act, ORS 196.105 to 196.165, define the term to mean "the area within the scenic area that is not an urban area or special management area." ORS 196.105(2).

"(2)  The proposed amendment is consistent with the purposes and standards of the Scenic Area Act; and

"(3)  No practicable alternative to the proposed amendment more consistent with the purposes and standards of the Scenic Area Act exists."

OAR 350-050-0030 (emphasis added).

B.  *Factual Background*

Broughton Lumber Company owns more than 260 acres of property in the scenic area, including an approximately 50-acre site that contains a former lumber mill. Milling began at the site in 1923. Major mill operations ceased in 1986, but the mill continued to operate at a reduced scale until 2001. Since then, the site has been used for light industrial activities, equipment maintenance, and storage. The site contains a complex of large industrial buildings. It is adjacent to a state highway and a state park.

### 1.  *The 1989 Resort Proposal and 1990 Resort Approval*

In 1989, approximately three years after major mill operations at the site had ceased, Broughton filed a land use application with the commission seeking approval for development of a resort on the mill site. The director of the commission evaluated the application and determined that "the resort as proposed would not encourage hotels, motels, restaurants or retail shops to locate within urban areas" and was, therefore, inconsistent with the second purpose of the Act, as pertinent here: "to protect and support the economy" of the gorge area by "encouraging growth" in existing urban areas. The director also determined that the proposed resort was inconsistent with the standards for commercial development in section 6 of the Act. *See* 16 USC § 544d(d)(7) (providing that the management plan shall include provisions to "require that commercial development outside urban areas take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area").

Broughton appealed the director's determination to the commission. In 1990, the commission affirmed the director's determination that the resort, as originally proposed,

violated the second purpose of the Act, as well as the standards for commercial development. Instead of the original proposal, the commission approved a modified version. The original proposal included "approximately 62 units of overnight accommodations * * *, a headquarters building, a restaurant, retail shops and daytime and overnight parking." The modified proposal called for reduction of the overnight accommodation units from 62 to 45 and elimination of the retail shops. It also called for removal of five former mill buildings and reduction of the scale of a proposed restaurant. Broughton never developed the resort, and the commission's 1990 decision approving the resort use expired in 1992.

## 2. *The 1991 Management Plan*

In 1991, the commission adopted the Management Plan for the Columbia River Gorge National Scenic Area (the management plan).[3] Most of the Broughton site is within the GMA and has been designated "commercial recreation." The goal of the commercial recreation designation is to "[p]rotect and enhance opportunities for commercially owned, resource-based recreation and supporting commercial uses on lands containing such existing uses or lands on which such proposed uses have been deemed consistent with the Scenic Area Act." Lands that qualified for designation as commercial recreation included privately owned lands in the GMA already devoted to resource-based recreation or that offered "outstanding" or "unique" opportunities for commercially owned resource-based recreation.

Management plan policies and guidelines for the commercial recreation designation allow, among other uses, commercially owned resource-based recreation uses; overnight accommodations that are rural in scale and part of or adjacent to, resource-based recreation use; and limited supporting commercial uses, such as restaurants, to accommodate overnight visitors and their guests. For the Broughton site, a recreation use could include an RV campground with

---

[3] Throughout this opinion, we quote the 2004 version of the management plan, as amended through June 2007. However, the provisions affected by the plan amendment at issue in this case have remained unchanged since adoption of the plan in 1991. The current version of the management plan can be found on the commission's website at http://www.gorgecommission.org.

up to 175 spaces and 35 overnight accommodation units. The recreational and commercial uses can take place alongside existing industrial uses.

The management plan guidelines also provide that "[e]xisting industrial uses in the GMA may convert to less intensive uses." A "less intensive use" is defined as "a commercial, recreation, or residential use with fewer adverse effects upon scenic, cultural, natural, and recreation resources."

### 3. The 2006 Proposal for a Plan Amendment

In the spring of 2006, Broughton presented a new proposal to the commission to develop the mill site into a resort. The proposal envisioned the construction of 250 new lodging units, recreational facilities, and commercial and utility facilities for resort guests and recreation-site users, developed over an approximately 10- to 20-year period. On May 3, 2006, the director of the commission held a "pre-application conference," in accordance with OAR 350-050-0045, to discuss potential amendments to the management plan implicated by the proposal. Following the conference, the director determined that development of a resort on the mill site would require new policies within the management plan and thus would be in the nature of a "legislative" amendment initiated by the commission, rather than a "quasi-judicial" amendment requiring an application. *See* OAR 350-050-0040(3) (describing both).

Accordingly, commission staff thereafter prepared a draft plan amendment based on policy direction received from the commission and input from the public. In August 2007, the staff released a proposed plan amendment that would "create new policies and guidelines [in the management plan] to allow conversion of an existing industrial complex to a recreation resort as a new review use in the Commercial Recreation land use designation."[4] The

---

[4] The amendment as originally drafted and as ultimately adopted differed in several significant respects. For example, as originally drafted, the amendment included a maximum of 210 accommodation units, with an average size of 1,000 square feet, in the recreation resort use. In addition, restrictions on long-term use applied to only 80 percent of the units. The cap on the total number of units was eventually eliminated in favor of use restrictions to prevent *any* long-term

commission held several days of public hearings on the amendment; in all, the commission received over 2,000 written comments and heard oral testimony from over 100 individuals, organizations, and entities.[5]

In April 2008, the commission approved a plan amendment allowing a new "recreation resort" review use on commercial recreation-designated property that contains "an existing industrial complex."[6] The approved plan amendment adds new policies, guidelines, and definitions to the management plan.[7] In particular, it amends the GMA policies governing the commercial recreation designation to include the following:

"6.  Redevelopment of an existing industrial complex as a recreation resort may be allowed if the result is protection of and enhancement to scenic, cultural, natural and recreation resources, and protection of tribal treaty rights. All uses must be part of an approved master plan and consistent with the policies and guidelines for recreation resorts contained in this chapter.

"A.  The overall scale of a resort shall be limited to ensure the resort protects and supports the economies of urban areas and protects scenic area resources. The total number of resort users shall be roughly equivalent to what is otherwise allowed in the designation.

"B.  All existing industrial uses shall be extinguished. All structures with the existing industrial

occupancy and "the use of the required impact evaluations, mitigation and enhancement requirements, and various design restrictions to determine the appropriate scale of a recreation resort." Moreover, square footage limitations for individual units were increased "to provide more flexibility and marketability of resort units, thus increasing its practicability."

[5] The complete record contains more than 5,000 pages.

[6] As a practical matter, although the amendment does not reference the Broughton site specifically, the commission expressly found that it is the only site in the scenic area that could meet all of the criteria for a recreation resort under the plan amendment.

[7] As the commission notes in its brief, the plan amendment does not itself "approve" a recreation resort on the Broughton site; rather, it provides the framework for Skamania County to enact a land use ordinance implementing the plan guidelines. See 16 USC § 544e(b) (providing incentives for counties to adopt land use ordinances consistent with the management plan).

complex that are not reused or restored for adaption to resort use shall be removed. Existing residential uses may remain.

"C.  Recreation uses (including campgrounds) consistent with the recreation intensity class guidelines associated with the recreation resort may extend to contiguous and adjacent lands under other land use designations if consistent with the adjacent land use designation and the recreation intensity class policies and guidelines. All recreation development shall be included in the resort master plan.

"D.  All accommodation units shall be designed for, and uses limited to, short-term occupancy to ensure the resort protects and supports the economies of urban areas.

"E.  Commercial uses shall be limited to ensure the resort protects and supports the economies of urban areas. Commercial uses shall be oriented toward serving resort guests and recreation site users rather than the traveling public.

"F.  The general scale (height, dimensions and overall mass) of buildings in the resort core may be compatible with the scale of the buildings located within the existing industrial complex prior to redevelopment as a recreation resort.

"H.[*sic*]  The recreation resort shall be compatible with the surrounding areas."

(Italics omitted.)

The amendment also adds detailed guidelines implementing those policies. Among other things, the guidelines prescribe approval criteria for a recreation resort, such as size, design, and use restrictions on accommodation units; limitations on commercial uses ("restaurants and pubs, a mini-mart, recreation equipment rental, and other small-scale retail and guest services" are allowed; "[g]as stations, banks, grocery stores, or other services commonly found in urban areas or catering to the traveling public" are not; conference and meeting facilities "may" be allowed); application requirements, including detailed specifications for what

must be included in a recreation resort master plan; and development standards.[8]

In a 58-page, single-spaced final order, the commission laid out its findings of fact and conclusions of law supporting adoption of the plan amendment. Briefly, the commission first determined that there had been significant changes in conditions in the scenic area under OAR 350-050-0030(1)(b) (new information regarding land uses or resources that could result in a change of plan provisions) and OAR 350-050-0030(1)(c) (changes in legal, social, or economic conditions not anticipated in the management plan). The commission identified five significant changes: (1) the decline in the timber industry; (2) changes in the orientation of the gorge economy from the wood-products industry to travel and tourism; (3) the decline in the use and condition of the industrial site and possible contamination and cleanup costs issues; (4) a change in legal conditions; and (5) trends in recreation uses and resort development.

The commission also evaluated whether the plan amendment was "consistent with the purposes and standards of the Scenic Area Act" as required under OAR 350-050-0030(2). The commission concluded that the amendment "provide[s] an incentive to bring a site with scenic impacts into conformance with the Management Plan's scenic standards, an increase in protection for existing adjacent recreation resources over existing Management Plan provisions, and enhancement of scenic, cultural, natural, and recreation resources," thus satisfying the first purpose of the Act. It further concluded that the plan amendment was consistent with the Act's second purpose—"to protect and support the economy of the Columbia River Gorge area by encouraging growth to occur in existing urban areas and by allowing future economic development in a manner that is consistent with [the first purpose]"—reasoning that (1) "[d]evelopment of the site as a recreation resort limited to short-term occupancy encourages other economic development in nearby

---

[8] The plan amendment also identifies an additional strategy for achieving the plan's scenic resources enhancement objectives—*viz.*, to "[p]rovide incentives to convert existing industrial complexes to uses more consistent with the purposes of the [Act] and land use designation." Finally, it defines the terms "recreation resort," "existing industrial complex," and "resort core."

urban areas * * *"; (2) "the commercial uses that would be at the resort would be limited to further support the economies of nearby urban areas"; and (3) the plan amendment "would enhance Gorge resources on-site and off-site." Finally, the commission concluded that alternatives to the proposed amendment were not practicable, or were less consistent with the purposes and standards of the Act, or both. *See* OAR 350-050-0030(3).

Petitioners subsequently filed this petition for judicial review challenging the plan amendment.[9]

## II. ANALYSIS

As noted, petitioners make three assignments of error: (1) that the commission lacked authority to amend the management plan because conditions in the scenic area had not significantly changed; (2) that the amendment violates the Act, specifically, the second purpose of the Act, which, as pertinent here, is to encourage economic development in the scenic area's urban areas; and (3) that the commission inappropriately made an "existing industrial use" determination.

A. *Whether Conditions within the Scenic Area Changed Significantly*

We turn first to petitioners' argument that the commission lacked the authority to amend the management plan. As set out above, the Act provides that the commission can amend the management plan outside the usual cycle only if "conditions within the scenic area have significantly changed."[10] 16 USC § 544d(h). In turn, a commission rule specifies what constitutes a significant change. OAR 350-050-0030(1). As described above, the commission identified five significant changes justifying the amendment. Petitioners challenge each of them.

---

[9] Any person or entity adversely affected by a final action of the commission relating to the implementation of the Act may obtain judicial review in the state courts of Oregon and Washington. 16 USC §§ 544m(b)(4), (6)(C). In Oregon, that review is in the Court of Appeals. ORS 196.115(2)(a).

[10] Petitioners do not contest the commission's determination that, because the provisions of the management plan affected by the amendment at issue in this case have remained unchanged since the adoption of the original plan in 1991, "significant change" is properly measured from that date, rather than 2004, the date of the most recent plan revision.

## 1. *The Decline in the Timber Industry*

In its order allowing the amendment, the commission observed, "One of the most significant changes in the Gorge since the Management Plan adoption has been socioeconomic change triggered by a reduction in timber harvest on both private and public lands, and particularly Federal lands." The commission concluded that, for the purposes of amending the management plan, the change qualified as a significant change under OAR 360-050-0030(1)(c), which provides that significant changes include "[c]hanges in legal, social, or economic conditions * * * not anticipated in the Management Plan."

The commission explained that, "[w]hile the decline in timber harvest began before adoption of the Management Plan, the magnitude, severity, and seemingly permanent changes and accompanying effects (both direct and indirect) were not known in 1991." It pointed out that certain events that affected the timber industry occurred after 1991, including, among other things, the 1992 settlement of a lawsuit regarding the listing of the northern spotted owl as a threatened species, the 1994 adoption of the Northwest Forest Plan to protect the owl on federal land, and the 1996 adoption of the Habitat Conservation Plan to protect the owl on state land in Washington. According to the commission, timber harvest levels decreased considerably after 1991. The decreased harvests resulted in mill closures, job losses, and weaker economies in timber-dependent counties, including Skamania County, and they affected the Broughton mill in particular. The mill was operating, albeit on a reduced scale, in 1991 when the management plan was adopted, but it ceased all operations 10 years later in 2001. Thus, at the time the commission approved the plan amendment in 2008, the mill had been closed for approximately seven years. According to the commission, the decline of the timber industry is relevant to the future use of the Broughton site because, as a result of the decline, "there is no potential for meaningful industrial use at the site, and a transition to a non-industrial use is needed." The commission acknowledged that "[f]actors contributing to timber harvest declines were evident in the 1980s," but it found that "the full force of the economic and

legal changes occurred after the adoption of the Management Plan."

Petitioners challenge the commission's conclusion that the decline in the timber industry qualifies as a significant change under OAR 350-050-0030(1). They argue that the commission erred in concluding that the decline in the timber industry was a change "not anticipated in the Management Plan." OAR 350-050-0030(1)(c). They assert, "It was universally known long before 1991 that timber jobs were on the decline." To support their assertion, they point out that, when the Act was being considered by Congress, there was testimony that the Act itself would result in losses of timber-related jobs. They also point out that the injunctions barring timber harvests on national forest land within the range of the northern spotted owl were in place in 1989, two years before the adoption of the management plan, and that timber harvests in the gorge had already begun to decrease considerably by 1991. Regarding the Broughton site, they argue that, because major operations at the mill had ceased in 1986, the mill "had long since ceased any major contribution to the Gorge economy."

Petitioners argue that the commission's assertion that it did not know about the decline in the regional timber industry "is incorrect." They also argue that it is "simply untrue that the mill closure is new information unanticipated at the time that the Management Plan was adopted in 1991."

As we understand it, petitioners' primary argument is that the commission misinterpreted OAR 350-050-0030(1)(c) when it concluded that the decline in the timber industry constituted a change in social and economic conditions "not anticipated in the Management Plan." Petitioners appear to take the position that, for the purposes of OAR 350-050-0030(1)(c), a change in the degree or duration of an anticipated change cannot be the basis for an amendment of the management plan. According to petitioners, the decline in the timber industry cannot be the basis for a plan amendment because the commission anticipated the decline, at least in part.

When reviewing the commission's interpretation of its own rule, we defer to the commission's interpretation

"unless no reasonable reading of the rule will sustain that interpretation." *Friends S055915*, 346 Or at 430; *see also Friends S055722*, 346 Or at 410 (under either federal or Oregon framework, court will defer to the commission's plausible interpretation of management plan); *Friends A131299*, 218 Or App at 245 (we will defer to commission's construction of its own rule "so long as it is not 'plainly erroneous or inconsistent with the regulation'" (quoting *Auer v. Robbins*, 519 US 452, 461, 117 S Ct 905, 137 L Ed 2d 79 (1997)).

■        Applying that standard of review, we readily conclude that the commission's interpretation of its rule to include changes in the degree and duration of the decline in the timber industry is plausible. A change in the rate, scope, or duration of a change is itself a change. For example, if a five percent population increase is anticipated, but the actual increase turns out to be 15 percent, the increase from five percent to 15 percent is itself a change. The commission's interpretation that OAR 350-050-0030(1)(c) encompasses such changes is reasonable. Therefore, the commission did not err in concluding that a greater decline in the timber industry than the commission anticipated would qualify as a change justifying amendment of the plan under OAR 350-050-0030(1)(c).

That brings us to the petitioners' argument that there was not a greater decline than the commission anticipated when it adopted the management plan in 1991. The commission's conclusion that the decline in the timber industry is an unanticipated change under OAR 350-050-0030(1)(c) is based on the commission's implicit finding that in 1991 the commission did not anticipate the full magnitude, severity, and permanence of the actual decline. Petitioners appear to challenge that finding.

We review the commission's findings of fact for "substantial evidence." ORS 196.115(3)(e). Substantial evidence exists to support a finding if the record, viewed as a whole, would permit a reasonable person to make the finding. ORS 183.482(8)(c); *see also Friends A131299*, 218 Or App at 244.

■        Before determining whether the commission's finding is supported by substantial evidence, we must first address petitioners' argument regarding the commission's use of evidence of changes outside the scenic area. Petitioners

appear to argue that the commission cannot consider evidence of changes outside the scenic area to determine whether there have been changes inside the scenic area. We reject that argument. Changes outside the scenic area can result in, or be representative of, changes within the scenic area, and, therefore, the commission is not categorically precluded from considering evidence of such changes as circumstantial evidence of changes within the scenic area. Here, the commission had evidence that logging rates for the gorge region had fallen and that mills in the gorge region had closed. Although that evidence was not specific to the scenic area, the commission could consider it and draw reasonable inferences from it.

It is true, as petitioners point out, that the commission can amend the management plan only if "conditions *within the scenic area* have significantly changed." 16 USC § 544(d)(h) (emphasis added). Nothing in the Act, however, precludes the commission from considering evidence of changes outside the scenic area when determining whether conditions within the scenic area have changed, which is what it did in this case. The commission used evidence of changes in the gorge region to conclude that conditions within the scenic area, and specifically conditions relating to the use of the Broughton site, had changed.

■ Having determined that the commission could consider evidence of changes outside the scenic area, we return to the issue of whether the commission's order is supported by substantial evidence. To resolve that issue, we must determine whether the record, viewed as a whole, would permit a reasonable person to find that the actual decline in the timber industry—including its magnitude, severity, and permanence—were not anticipated in the adoption of the management plan.

We conclude that a reasonable person could find that the changes in the timber industry that have affected the scenic area were not fully anticipated in the adoption of the management plan. A reasonable person could find, as the commission did, that, "[g]iven all that happened around the time and after the Commission adopted the Management Plan in 1991, the Commission could not have known the

extent and permanence of [the decline in] timber harvest levels, or its economic effect." A reasonable person could conclude that the decline was more severe, in depth and duration, than anticipated in 1991.

In sum, the commission did not err in concluding that a greater decline in the timber industry than anticipated could serve as a basis for an amendment to the management plan, in considering evidence from outside the scenic area to determine whether conditions had changed within the scenic area, or in finding that there actually had been a greater decline in the timber industry than anticipated at the time of the adoption of the management plan, and that that greater decline affected conditions within the scenic area. Therefore, the commission did not err in concluding that the greater-than-anticipated decline in the timber industry was a significant change for the purposes of amending the management plan.

### 2. *Change in the Gorge Economy*

The second significant change identified by the commission is the shift in the gorge economy "from natural resource extraction to an increased dependence on tourism for employment." The commission found that, "[w]hile timber jobs were declining in the late 1980s, that decline appeared to be only cyclical based on past data." But, because "timber did not rebound as it had in the past," the job losses in the gorge economy "were much deeper than were expected when the Commission first adopted the Management Plan in 1991." In addition, "[s]ince 1991, the Gorge has experienced dramatic changes due to growth in the travel and tourism industry," particularly since the mid-1990s. Given the changes in both the timber and travel industries, the commission reasoned that conversion of the Broughton site to a resort would be "consistent with and respond[ ] to the changes that have occurred in Skamania County, and elsewhere in the Scenic Area."

The second significant change identified by the commission is similar to the first, as are the petitioners' arguments challenging the commission's reliance on it. Petitioners argue that the increase in tourism was anticipated when the management plan was adopted. They point out that the

Act was specifically intended to promote tourism and generate jobs. They also point out that the management plan itself describes the growing importance of tourism in the gorge.

■ Petitioners make a strong case that the increase in tourism was anticipated in the management plan. But, as with the decline in timber harvesting, the change that the commission identified was not the simple increase in tourism; rather, it was the increase above and beyond what had been anticipated at the time of the adoption of the management plan. For the reasons discussed above, we conclude that such a change can serve as the basis for a plan amendment. We also conclude, again for the reasons discussed above, that the commission could use information about areas outside the scenic area as circumstantial evidence of changes within the scenic area, and, therefore, the commission did not err, as petitioners assert, by considering statistics about the gorge counties in their entirety, as opposed to the portions of the counties within the scenic area. We conclude that, like the commission's finding that the actual decline in the timber industry was greater than anticipated, the commission's related finding that the extent of the need to shift from an economy based on timber to one based on tourism was greater than anticipated is supported by substantial evidence. Therefore, the commission did not err in concluding that the change in the gorge economy was a significant change under OAR 350-050-0030(1)(c).

3. *Decline in the Use and Condition of the Site and Cleanup Costs*

The third significant change identified by the commission was "new information" regarding the potential costs of decommissioning the mill and hazardous waste cleanup at the Broughton site. Under OAR 350-050-0030(1)(b), "[n]ew information or inventory data regarding land uses or resources that could result in a change of plan designation, classification, or other plan provision" constitutes a significant change for the purposes of amending the management plan.

The commission found that "there is a high likelihood of contamination" at the Broughton site and that "it is reasonable to assume that there would be significant costs

associated with hazardous waste cleanup." The commission reasoned that the cost of cleanup would affect the type of resort that would be economically feasible at the site and, after reviewing several economic analyses of potential resorts, concluded that the resort use permitted under the management plan without the amendment—an RV campground and a 35-unit resort—"is probably not cost-effective."

The commission concluded that information regarding the cost of decommissioning the mill and cleaning up the site qualified as "new information" under OAR 350-050-0030(1)(b) because the commission had not considered it at the time of the adoption of the management plan in 1991. The commission stated that its records do not indicate why the information was not considered previously, but suggested that it might have been because the plan for developing the site in 1990 left most of the mill intact, and, at that time, Broughton planned to continue to use the mill (and in fact continued to use the mill, albeit at a reduced scale, for more than 10 years).

Petitioners challenge the commission's conclusion that the potential cost of cleanup at the Broughton site constitutes a significant change in conditions justifying an amendment to the management plan. They argue that "there is not substantial evidence that the Broughton site is in fact contaminated." That is true, but the commission did not find that the site is in fact contaminated. Rather, the commission found that there was a "high likelihood of contamination" and that "it is reasonable to assume that there would be significant costs associated with hazardous waste cleanup."

Those findings were supported by substantial evidence. Commission staff investigated decommissioning and cleanup costs for several other mill conversion projects in Oregon and Washington and found that all of them involved some cleanup and removal of hazardous materials, with costs ranging from $100,000 to over $2 million. As the commission explained,

> "[e]ven though there is no record of a hazardous material release at the Broughton mill site, fuels, solvents, lubricants, and cooling fluids were all commonly used at mill sites to keep mill machinery operating. Work methods for

preventing the spread of such hazardous materials have improved only relatively recently and there is a high likelihood that at least some of these materials were incidentally spread at the site over its 80-year history. In addition, there are four remaining underground storage tanks used to store fuel oil and gasoline at the site. They are located between 250 and 600 feet from the Columbia River * * *. The Broughton Mill also contained other features typical of old sawmills where contamination and/or hazardous materials have been found."

Petitioners also appear to contend that the probability of contamination at the Broughton site is not "new information" that constitutes a significant change, asserting that, at the time the commission adopted the management plan in 1991, it was well known that a lumber mill had operated on the site and that lumber mills can be contaminated. The difficulty with petitioners' argument is that we have already held that information need not be newly created or newly available to constitute "new information" under OAR 350-050-0030(1)(b). Instead, as *Friends A131299* establishes, "new information" includes information that the commission simply has not considered before. 218 Or App at 245-46.

*Friends A131299* involved an amendment to the management plan to allow certain commercial uses on historic properties in the scenic area as a means to create economic incentives for maintenance and rehabilitation of the properties. In that case, the commission concluded that the amendment was justified by "new information," specifically, information that some significant historic properties in the scenic area were "deteriorating" and "in need of stabilization," that restoration and rehabilitation of historic properties was "very costly," and that many property owners were "not willing to spend the money out of their own pockets to make repairs." 218 Or App at 240. The petitioners argued that, because that information was "common knowledge" and simply a "rehash of existing information," it was not "new information" under OAR 350-050-0030(1)(b). *Id.* at 244-45. The commission disagreed; it understood the rule to include information that was *new to the commission*. We accepted the commission's interpretation of its own rule, noting that the dictionary definition of "new" includes "having been seen or

known but a short time although perhaps existing before."[11] 218 Or App at 245 (citing *Webster's Third New Int'l Dictionary* 1533 (unabridged ed 2002)). Thus, in this case, information regarding the costs of decommissioning the mill and cleaning up the site qualifies as "new information," because, regardless of whether the information existed when the management plan was adopted in 1991, it had not been previously considered by the commission.

### 4. *Change in Legal Conditions*

Petitioners' challenge to the fourth significant change identified by the commission—a change in legal conditions in the area—requires little discussion. In *Friends A125031*, 215 Or App at 605-06, this court held that a management plan provision allowing for the expansion of existing industrial uses in the GMA under certain circumstances violated the Act. We held that the provision "flatly contradict[ed]" the Act's requirement that the management plan " 'prohibit industrial development in the scenic area outside urban areas.' " *Id.* (quoting 16 USC § 544d(d)(6)).[12] Here, the commission concluded that our decision in *Friends A125031* was a legal change "not anticipated in the Management Plan," OAR 350-050-0030(1)(c), because it prohibits expansion of the industrial use at the Broughton site, thereby frustrating the plan for the site envisioned in the original management plan—that of a small recreation resort located adjacent to a valuable existing industrial asset.

Petitioners argue that, without evidence of "any attempt, expectation, or stated desire by Broughton to actually expand its industrial operations," "it is impossible to conclude that the court's ruling constitutes a significant change in circumstances." They further argue that, because expansion of industrial uses has always been in violation of the Act, this court's recognition of that violation cannot constitute a change in legal conditions.

Again, given the deferential standard by which we review the commission's interpretation of its own rule, we

---

[11] On review in the Supreme Court, the petitioners did not challenge our holding in that regard.

[12] The commission did not seek Supreme Court review of that holding.

agree with the commission. Until we decided *Friends A125031* in 2007, the management plan expressly allowed for the expansion of industrial uses at the Broughton site. Regardless of whether Broughton ever intended to expand the industrial uses at the site, expansion was a possibility that informed the commission's plan for how best to encourage the redevelopment of the site. Our decision in *Friends A125031* changed that calculus. The commission did not err in concluding that there had been a change in legal conditions within the meaning of OAR 350-050-0030(1)(c).

### 5. *Trends in Resort Design and Development*

■ Finally, petitioners challenge the commission's findings with respect to trends in recreation uses and resort development that have evolved since adoption of the plan. To the extent petitioners argue that those findings cannot justify a change to the plan because the commission improperly relied on information concerning trends in resort design and development outside the scenic area (specifically, in central Oregon), we reject that argument for the same reasons that we rejected petitioners' challenge to the first two significant changes identified by the commission. Nothing in the Act necessarily precludes the commission from considering and utilizing that type of information to inform its decision. Moreover, the information challenged by petitioners in this instance was not the basis for the commission's finding of a significant change. Instead, the commission pointed out that data reflecting trends in resort development in central Oregon was *consistent with* the site-specific analyses considered by the commission.

Petitioners also argue that substantial evidence does not support the commission's findings that form the basis for its determination that there has been a significant change in recreation uses in the area indicating that development of an RV campground on the Broughton site (as allowed under the plan) may not be economically viable and may "compete with current struggling private campgrounds." They contend that the commission improperly focused on evidence of low vacancy rates at three RV campgrounds in the scenic area, where other evidence—in particular, an economic analysis prepared at their request—showed that *average* occupancy

rates at RV campgrounds within the scenic area are "very close to the national average" and that a 175-unit RV campground development on the site would be economically feasible.

As the commission's order explains, the commission heard conflicting evidence on the subject of RV campground occupancy rates and whether development and operation of an RV campground on the site was economically viable (including evidence contradicting many aspects of petitioners' report). Based on its evaluation of all of the evidence, the commission made the findings noted above. We have reviewed the evidence and conclude that the record, viewed as a whole, would permit a reasonable person to make those findings.

## B.  *Consistency with Purposes and Standards of the Act*

Petitioners also contend that the second criteria for approving an amendment to the management plan—*viz.*, that it be "consistent with the purposes and standards of the Scenic Area Act," OAR 350-050-0030(2)—was not satisfied in this case. As the Supreme Court explained in *Friends S055916*, 346 Or at 444, an argument that a plan amendment is inconsistent with the Act is analogous to a "facial" challenge to the validity of a rule under the Oregon Administrative Procedures Act. As such, we review to consider whether the commission "departed from a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute." *Id.* (internal quotation marks omitted); ORS 196.115(3)(d)(A), (C) (providing for a remand if the court finds the challenged commission action to be "[o]utside the range of discretion delegated to the agency by law" or "[o]therwise in violation of a constitutional or statutory provision").[13]

---

[13] Although it is not entirely clear, the parties apparently understand this argument to implicate ORS 196.115(3)(d)(B), providing for remand of a commission action that is "[i]nconsistent with an agency rule, an officially stated agency position or a prior agency practice, unless the inconsistency is explained by the agency." This is an example of an instance in which the statutory standard for judicial review of commission actions embodied in ORS 196.115—a standard that both applies and mimics certain provisions of the Oregon Administrative Procedures Act pertaining to judicial review of orders in *contested cases*—is, as we and the Supreme Court have previously noted, "less than a perfect fit," because the commission action under review is essentially *legislative* in nature. *See Friends*

The focus of petitioners' argument with respect to this assignment of error is that the amendment is inconsistent because it "fails to comply" with the commission's 1990 decision that a smaller scale resort violated the Act. As we understand it, petitioners' contention boils down to this: Because the commission earlier determined that "a resort development of a much smaller magnitude at this site" was inconsistent with the Act's second purpose to encourage growth in urban areas, the present amendment, which "greatly exceeds the scope and scale of what the Commission previously rejected," *necessarily* also violates the Act.

As discussed above, Broughton Lumber's 1989 application to build a destination resort, which included approximately 62 lodging units and related commercial services, was denied by the director of the commission on the ground that the proposal was inconsistent with promoting economic growth in the existing urban areas. On appeal of that decision, the commission agreed with the director's conclusion, reasoning that "[h]otels, motels, retail shops and large-scale restaurants can all be located within urban areas" and that "[a]pproval of the resort as initially proposed would not encourage these facilities to locate within urban areas."[14] As a result, petitioners argue, "[a] level of development *less* than what was rejected is *necessary* to be consistent with the second purpose of the Act." (Emphasis in original.)

The commission responds that the amendment is not inconsistent with the 1990 decision (or the 1991 management plan[15]) because the "factual contexts" differ. Most concretely, the commission points to the fact that those prior

---

*S055722*, 346 Or at 375 (internal quotation marks omitted); *Friends A125031*, 215 Or App at 568.

In our view, ORS 196.115(3)(d)(B) appears to provide a standard of review pertinent to a typical contested case proceeding and thus may be incongruous when applied to the commission's legislative action at issue this case. In all events, even if we were to consider petitioners' argument under that standard, we would conclude that the commission adequately explained any "inconsistent" agency position.

[14] As also previously noted, the commission ultimately approved a plan that included up to 45 units of overnight accommodations, a restaurant, and a recreational rental shop, subject to certain conditions. Even more restrictive limitations were included in the later-adopted management plan. *See* 236 Or App at 485-86.

[15] The commission's explanation focuses primarily on the differences between the original management plan adopted in 1991 and the proposed amendment,

actions permitted a resort development *adjacent* to existing mill buildings and industrial uses, whereas the present amendment essentially requires that any resort development *replace* the industrial use. The commission also points out that, under the plan amendment, a recreation resort must enhance the scenic, cultural, natural, and recreation resources on and surrounding the property—requirements that did not exist previously.

■       We need not resolve that dispute because, even if we were to assume that the decisions are factually analogous, we disagree with petitioners' conclusion that the commission's earlier determination—that a 62-unit development would not be consistent with the Act's second purpose—establishes a development "ceiling" that forever limits the size of a development that is consistent with the Act.

As we have noted, the commission is required to review the management plan at least every 10 years "to determine whether it should be revised." 16 USC § 544d(g). Moreover, the commission is authorized to amend the management plan "at any time" if the commission determines "that conditions within the scenic area have significantly changed." 16 USC § 544d(h). In enacting that scheme, Congress clearly envisioned that the management plan would evolve as circumstances and conditions changed. It follows that the commission's understanding as to the type and level of development that would or would not subvert the Act's purpose of encouraging economic growth in designated urban areas may also change. Thus, the ultimate inquiry under OAR 350-050-0030(2) is whether the amendment is consistent with the purposes and standards of the Act given the conditions existing at the time of the amendment.

■       The commission's order explains, in 17 pages of detail, why that is the case here.[16] With regard to consistency

_____

rather than between the commission's 1990 decision and the amendment. That is of no material significance, however, because the management plan permits even less intense development than was permitted by the 1990 decision. *See* 236 Or App at 485-86.

[16] Further, the commission explains that, in 1990, the mill site was still being maintained and used for mill operations, whereas, at the present time, "the buildings are dilapidated, overgrown with invasive plants, such as blackberry, and mostly unused," thus negatively affecting the scenic resources of the area. Those

with the Act's second purpose, the commission explains that, because of short-term restrictions on lodging units, the contemplated recreation resort will draw an influx of short-term visitors who will avail themselves of commercial establishments in the existing urban areas.

Although the commission heard some testimony suggesting that a recreation resort would be inconsistent with the Act because it would compete with hotels, motels, inns, restaurants, and retail shops in the urban areas, other evidence indicated that a recreation resort would encourage and support economic development in those areas by increasing the total number of tourists drawn to the scenic area. The commission also noted a current lack of short-term accommodations, particularly on the Washington side of the central gorge, and cited evidence indicating that the use contemplated by the amendment would offer a new type of recreation attraction not currently available in the area, thereby attracting a different segment of the tourism market.

The commission cited evidence finding that

"there is general agreement and substantiation that new travel industry capacity benefits the existing travel-related businesses in the area. It is not a zero-sum situation where a gain in one business results in a corresponding loss in another; instead the increased capacity brings even more revenue to the area."

The commission ultimately concluded that the amendment achieved the appropriate balance between allowing enough commercial amenities to make a recreation resort viable, while at the same time restricting the availability of commercial goods and services so as to encourage resort visitors to obtain services in the established urban areas, thereby encouraging economic development in those areas.

factors, combined with the mill's location, the size of the buildings, and the visual dominance of the mill site as seen from Washington State Route 14, led the commission to conclude that the "plan amendment would encourage the conversion of an existing industrial use to a less intensive use with fewer adverse effects upon scenic, cultural, natural, and recreation resources consistent with [GMA guidelines] and would remove a visually discordant feature consistent with [plan objectives]."

The commission did not err in that determination. Contrary to petitioners' understanding, the commission's 1990 decision did not, and could not, impose an immutable rule that all resorts at the Broughton site with more than 62 accommodation units would automatically violate the Act. Rather, whether a land use is consistent with the Act depends on the particular characteristics and context of the use. Here, the commission amply substantiated why, given the limitations on the contemplated resort and the presently existing circumstances, the resort would be consistent with the Act's second purpose.[17]

## C.  *Existing Industrial Use*

In their final assignment of error, petitioners assert that the commission's final order "inappropriately reaches a determination as to whether the Broughton site contains an existing industrial use." According to petitioners, the commission does not have legal authority to issue an existing use determination for the Broughton site—a determination that can only be made by Skamania County—but that the commission did so in its final order by referring to the site, for example, as "the existing industrial site" or the "industrial site." Petitioners contend that the final order must therefore "be reversed and remanded, with instructions to delete any finding or conclusion as to whether the Broughton site contains a legally existing industrial use."

In response, the commission expressly disavows that it ever, in its final order, purported to make a *legal* determination as to an "existing industrial use" at the Broughton site. Rather, the commission states that it discussed the Broughton site using those descriptive terms simply for planning purposes:

---

[17] Petitioners assert, in passing, two additional arguments that the plan is inconsistent with the Act. Those arguments, which pertain generally to the recreation assessment requirement and the prevention of cumulative adverse effects to natural and cultural resources, are undeveloped, and, for that reason, we decline to address them. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself.").

"The commission did not determine that there is existing use occurring at the Broughton mill site. * * *

"* * * Whether there is existing industrial use occurring on a site where a developer proposes a recreation resort is a question that must arise when applying the plan amendment."

In light of those explicit statements by the commission, we see no need to remand the order to clarify that the commission did not make an existing use determination.

### III.  CONCLUSION

Petitioners have failed to demonstrate that the commission erred in determining that conditions within the scenic area have significantly changed since adoption of the management plan in 1991. Nor are we persuaded that the amendment is inconsistent with the purposes and standards of the Act in the manner suggested by petitioners. Finally, we reject petitioners' argument that the order must be remanded to delete references to the "existing industrial use" at the site.

Affirmed.